5-25-0537 People v. Ken Conerly Appellant Mr. Raymond Appellant Mr. Nicolosi Appellant Mr. Raynard Appellant Mr. Conerly Your Honors, this is a case where this Court has already found trial counsel ineffective for his representation of Conerly on the AHC counts. Following a post-remand Franco hearing, the trial court found that counsel committed three additional errors related to reckless discharge. Those errors also prejudiced Conerly both individually and cumulatively. The prejudice on any one of these errors warrants reversal. First, counsel failed to object to a Sgt. Warren's testimony narrating a surveillance video in which Warren identified Conerly as the man in the video who possessed and fired an object Warren identified as a gun. He also testified that the video showed three muzzle flashes. Warren's testimony was highly whether Conerly was the person who fired a gun that day. That is a question that the State's only occurrence witness was unable to answer both at the scene and in court. After hearing identification testimony from a police officer, the jury was likely to convict. Trial counsel even But counsel, if I recall, the officer was on the scene and actually had an interaction with Mr. Conerly and it was on video as well, correct? I mean, the officer was part of the video. Is that accurate? Yes, Your Honor. The officer had a brief interaction with Mr. Conerly. However, he was not the officer that interviewed Conerly. There were two other officers that actually sat down and talked to him. In Thompson, the Illinois Supreme Court's opinion in Thompson discussed that because of the immensely powerful impact of police officer identification testimony, that the reliability of that testimony needs to be tested prior to trial and it wasn't here. We really don't know the extent of Warren's interaction and he certainly had, you know, nothing Well, we know on the video, though, that he was speaking with the man and he testified him to his clothing and he recognized him as the man later in the video. I mean, we have that video, correct? We have a video showing a brief interaction with Warren and Conerly, yes. But at the same time, Thompson discussed having more of an intimate relationship with the defendant in order to add something to the jury's consideration of the identification. Here, the jury saw Conerly as well. They saw Conerly in court and could determine for themselves whether the person in the video showed, you know, the person in the video was Mr. Conerly or not. You know, Sergeant Warren didn't actually see the shooting and wouldn't, the only occurrence witness did not identify Conerly as the person even though he was, you know, at the scene as well. The likelihood of Warren's testimony negatively impacting the verdict was particularly high when the state played the video several times during closing arguments and encouraged the jury to adopt Warren's interpretation of it. This error alone warrants reversal because the state's case was weak. There was no valid identification witness. The DNA evidence did not narrow the shooter down to Conerly and the ballistics evidence was consistent with Conerly's version of events that Skyler fired the gun. Counsel also failed to object to the state's closing arguments that the defense failed to present forensic evidence and encouraging the jury to hold exculpatory evidence including exculpatory statements from Conerly against him. It's well recognized that shifting the burden to the defense to any extent is prejudicial, but the prosecutor's comments here were particularly damning where the state's own DNA evidence was not strong. The state did not present GSR evidence and Conerly in fact did make exculpatory statements prior to trial where he told Lieutenant Newell that Skyler was the one who fired the gun. Counsel also elicited damaging testimony from the state's DNA expert indicating that the defense could have free DNA testing if it had requested it. This testimony particularly combined with the state's closing arguments regarding the absence of DNA evidence was likely to lead the jury to believe that the defense failed to prove Conerly's innocence. Each of these errors was sufficiently prejudicial to warrant reversal, but the cumulative impact was simply insurmountable. But there was a video with the defendant in the video in what appears to be a gun, or an object I should say, and flesh, correct? That the jury could see for themselves. There was a video with a man and an object. Whether that man was Conerly was a determination for the jury to make. So, you know, the video itself is a very low quality brainy video and it would have been difficult or certainly a reasonable probability of a different outcome absent Warren's testimony. Counsel also, even though the trial court did not find it to be an error during the critical remand, counsel also failed to object to the omission of the video, which we believe was an error as well, where the video was produced by a non-testifying third party. It was a compilation of clips that was made to represent Warren's version of events. There's no testimony about the reliability of the process that produced that recording, of what editing was done. There's no testimony from the editor about the authentication of the video and no evidence about the copying or duplication process. So we don't know really what the actual scene looked like. I mean, even part of that video, Warren testified sort of guard shack and he said there was nobody in it at the time of the video but that there was supposedly somebody there at some time. So if that person, you know, looked similar to Conerly or was wearing similar clothes, that could have impacted the jury's There's also another man in the fountain. I sound like I'm pronouncing Gabriel's name. I don't know if that's correct, but there's another man in that car who did not testify and we don't know where he went or what he was wearing. So there were a lot of holes in the state's case here. So, Your Honors, given counsel's errors, we've asked that you reverse Mr. Conerly's conviction and remand for a new trial. No, thank you. All right, thank you. You all have time to move on. Thank you, Your Honors. And Mr. Nicolosi, whenever you're ready. Good afternoon, Your Honors. May it please the Court, counsel. My name is Justin Nicolosi. I represent the state of Illinois in this case. The state would argue that this Court should affirm the trial court's denial of the motion for a new trial based on ineffective assistance in this case. Starting with where Mr. Rayner left off regarding the foundation for the video that counsel Dedman did not object to, the statement that submits that based on the confluence of two different cases, People v. Taylor, a state of Illinois case, People v. Dennis, a case from this Court, that the foundation does not need to be perfect in order for a recording to be admissible. It's a well-cited proposition of law that the fact that a recording exists at all is evidence that the recorder was functional. I mean, the operator knew how to use it. In this case, we have a video. Not only do we have a video, but we have an eyewitness, Gabriel LaFountain, who, as I said in my brief, really couldn't have been any closer to the shooter in this case. He saw the video at trial. He confirmed that the events on the video were those that he observed. We saw the person in the big white shirt walk from the left, stop right in front of the vehicle where Mr. LaFountain and his acquaintance were sitting. The person in the white shirt raised his arm in the air. I think we could all pretty much see three flashes from this item, which, of course, we can assume was a gun. Then the person in the white shirt went to the apartment building, was there for about five minutes. In about five minutes after leaving, inexplicably, he comes right back to where that car was. Mr. LaFountain and the acquaintance, they're out of the car. They even interact with this person. At that time, the police had arrived. The person in the white shirt and the woman, they start to go back to the apartment complex, and the officers are there. Mr. LaFountain with a flashlight points them out to officers, even though he didn't want to get close enough for a classic identification. I think we shouldn't leave our brains at the door here. We know that the person in the big white shirt who was eventually contacted by police was the defendant. Sergeant Warren was one of those individuals who contacted the defendant. We know that that's the same person because Mr. LaFountain said that's the same person. The person with the woman went to the apartment, came back. So the fact that these events are recorded on the video, Mr. LaFountain said, yes, that's what happened. Those are the events that I observed that night. Based on Taylor and Dennis, we can confirm that the process that produced this recording was reliable, even though we didn't have somebody from Watchtower testify to it. I think we can all, based on this case law, the foundation would have been, it was laid, even if Mr. Dedman had objected, that would have been overruled. Regarding the errors that the trial court found, the state submits that the trial court was proper in finding that there was no prejudice to the defendant. The trial court said, quote, there's fairly significant evidence pointing to the defendant, end quote. The state submits that that's exactly right. As I just pointed out, Mr. LaFountain couldn't have been any closer. He saw this person, identified him to police. They made contact with him. They searched the apartment, found the guns. The testing established that the casings that were found around Mr. LaFountain's car matched the test fire from one of those firearms. The defendant's DNA was on the firearm. What else do we have? We have, yeah, again, I think even though we have counsel made some errors, there's no question about that. But I think as I just kind of summarized, the fact that we have sufficient video here that established plus Mr. LaFountain kind of tying all of these events together, this man going and coming back, firing the gun inexplicably, there really shouldn't be any question here. The jury had the video themselves. The jury watched the video, yes, Your Honor. They were able to see what happened. There's no question that the gun was fired. There's also no question, I know the defense's theory of the case was that Skyler did it. I think the defendant talked to police. He initially denied it, or denied being around, and then he said Skyler. That's not a legitimate theory in this case based on the evidence that we have. Mr. LaFountain, again, how far was he? A few feet. He was in the driver's seat. Mr. Connerly was right out in front. It wasn't a woman who did the shooting. It was the man in the big white shirt. That was the defendant. So I understand Mr. Dedman has to put on a defense. You have to do something. But in this case, the evidence does not support that anyone other than the defendant, whose DNA was on the handle of the gun, was the person who fired this firearm. The state submits that the trial court below was proper and correct in finding that there was no prejudice based on the significance of the evidence against the defendant, and this court should affirm it. If there are any other questions, I'd be happy to answer them.  No questions. All right. Thank you very much. All right. Mr. Reina? Roberto? Thank you, Your Honors. Your Honors, we don't know that the person police talked to after the incident was the shooter. The state's interpretation, I believe it's overstated LaFalcon's testimony. While he was close to the incident, he has never identified Connerly as the shooter. He, at the scene, declined to identify him in a show-up and testified that he did not see the shooting. Even though Connerly was wearing a white T-shirt, LaFalcon specifically testified he was unsure if Connerly was the person, despite the similar clothing. While the jury did see the video, its interpretation of it was influenced by Warren's testimony, stating that Connerly was the person in the video and the state's improper closing arguments. After Warren's testimony, the state's evidence was weak. The DNA evidence, there were three profiles on the gun. The state didn't even test two of them. Connerly was not identified as a major contributor. There was just a possibility that one of the three profiles was his, and Schuyler was seen going in and out of the same apartment in which the gun was found. So the evidence absent Warren's testimony did not narrow down the shooter to Mr. Connerly, and there was a reasonable probability, absent Warren's testimony, that the jury could have reached a different conclusion. Are there no further questions, Your Honor? No questions. Thank you very much. Thank you both for your arguments here today. We will take this matter under advisement. We will issue a ruling in due course, and we will stand in recess until tomorrow morning at 9 a.m. Thank you. All rise.